We'll hear argument first this morning in Case 09-329, Chase Bank v. McCoy. Mr. Waxman? Mr. Chief Justice, and may it please the Court, the question presented is how to interpret a since-amended version of Regulation Z. In amicus briefs filed, solicited by the First Circuit and by this Court, the Federal Reserve Board has confirmed that it has long interpreted its regulation just as Chase Bank and the rest of the regulated credit card industry understood. Mr. Waxman, can I ask you about the deference that we should give to the briefs that have been filed in the First Circuit and the invitation brief in this case? Our deference seems pretty foursquare with this. It's a brief that was filed to interpret an agency regulation. But I'm wondering whether our continues to remain good law after Christensen and Mead. In Christensen, the Court held, and I quote, "...interpretations such as those in opinion letters, like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law, do not warrant Chevron-style deference." And Mead said pretty much the same things. So it seems to me that there are three possibilities for why our remains good law. One is that briefs are somehow different from all those other things that we talked about in Christensen. Another is that an agency gets more deference when interpreting regulations than when interpreting its own statutes, something that I think I just don't quite understand, but maybe you could convince me of it. And a third is, well, look, they're just basically inconsistent, but our was our and we don't feel like overruling cases, and we're not so sure we got it right in Christensen and Mead anyway. So which is it? Waxman. A lot of the above. First of all, our has been applied in the context of amicus briefs since Christensen and Mead, both unanimously, both in Kennedy and in Long Island Care at Home. And I must say, in both of those cases, the deference was to a brief that acknowledged a change in the agency's position, which is quite unlike what's going on here. Absolutely right, Mr. Waxman, but in each of those cases it was basically a sentence or two. We never really addressed the possible conflict between our and Christensen and Mead. Nonetheless, I think those cases stand for the proposition that our is alive and well. And in any event, as your question pointed out, both Mead and Christensen and the passage in Christensen that you're referring to dealt with the question of Chevron deference to informal letters from the sub — from, you know, a — somebody who was employed by an administrative agency. And the question in the case, the interpretive question in the case in the Chevron context is, what confidence can we have that Congress has in fact delegated to the agency interpretive or rulemaking authority in this context? And so, for example, in Mead, the Court distinguished between notice and comment regulations that Custom put out as opposed to the kind of determinations that were made by 46 different offices at the rate of something like 15,000 letters a year. In the — when Christensen dealt with the our question, because it did involve an informal opinion of the wage and hour administrator, both interpreting the Fair Labor Standards Act and a regulation. When it came to interpreting the regulation, what this Court said is, our deference doesn't apply here because we read the regulation as clear. And our, of course, made clear that deference is due to an agency brief unless it is plainly erroneous or the regulation is clear. Now, here we have a situation in which it is not an agency, staff or whatever, that is applied. The First Circuit asked the government for the — solicited the Federal Reserve Board itself to explain the meaning of its own regulation. And the brief that was filed represented that it was the longstanding and consistent interpretation of the Federal Reserve Board. Ginsburg. Mr. Waxman, I take it from this whole discussion that you are recognizing that this is not a crystal clear regulation. There is some ambiguity, and that's why we're talking about how much deference we owe to the agency. That's correct. We think that the Federal Reserve Board's reading of the two regulatory provisions is the better reading, but we acknowledge, as every court, I think, that has addressed this, that there is some ambiguity just looking at the regulations. But I think it's important to understand also that the views expressed in the amicus brief solicited by the First Circuit and by this Court are entirely consistent with explanations that the board, as a board, provided in the course of a four-year rulemaking process about what these provisions mean. So you think the same deference is owed to ANPRs as to the amicus briefs? What is your position on that? I think that if it weren't for the amicus briefs in this case, which are later in time and address the very specific question that's presented in this case, our deference would be appropriate, and it's not just an ANPR. There was the Federal Reserve explanation accompanying the ANPR, a functionally identical explanation accompanying the proposed rule, and one also accompanying the final rule. And those explanations of the board are entitled to our deference. After all, in Anderson-Ford, another case involving the construction of Regulation Z, this Court acknowledged that deference was due to a proposed change, the commentary accompanying a proposed change in Regulation Z, which had not in fact even been implemented.  Kennedy, you're not very much on the advance notice of proposed rulemaking. I'm sorry, Justice Kennedy. Judge Cudahy, in dissent, relied considerable reliance on the ANPR. Yes, and in fact, Justice Kennedy, I would say that both the majority and the dissent below referred to the ANPR when both when they were referring to the commentary to the ANPR and the commentary to the actual proposed rule in 2007. Now, of course, Judge Cudahy was deciding this before the First Circuit had solicited the views. On rehearing, we urged the Ninth Circuit to solicit the views of the Federal Reserve Board if there were any doubt because a split had been created, but it declined to do so. And of course, I suppose, having done it twice before, we could, in this case, apply our without explaining why it is that our is not inconsistent with Mead, right? We did it twice before. We could do it here. Sure. Or you could explain that it is not in any way inconsistent with Mead, because Mead It's a lot more trouble, though. So be sure, but you granted plenary review in this case, and I just want to understand. I'm not trying to be flip here. I don't think that there is any inconsistency between our and Mead. Mead involved the question of whether or not there was the court could be confident that Congress had delegated some sort of lawmaking function to these letters that were written by customs officers across the country to individual importers when the letters themselves made clear that they couldn't be relied on by anybody other than that particular importer, and only unless and until the customs officer changed her mind. But Mead did put a lot of emphasis on procedural formalities. So, you know, Justice Scalia sort of snidely, but I think accurately, described Mead as saying only when agencies act through adjudication, notice and comment rulemaking, or some other procedure indicating comparable congressional intent, whatever that means, is Chevron deference applicable. So, you know, this is not an adjudication. It's not a notice and comment rulemaking, and it's hard to see why there is some procedure here indicating comparable congressional intent as Mead would require. Justice Kagan, with respect to the Mead question, which is a Chevron question, the Board's explanation in 2000 and published in the Federal Register in 2004, and again in 2007, and again in 2009, is a formal explication of the Board's rules pursuant to its very, very broad rulemaking authority under the Truth in Lending Act. Breyer, of course, you can also read Mead and decide what it says. Being in the majority, I thought that the dissent's characterization was not what it said. I mean, the dissent can write what it wants to write, but I don't think that that was what Mead said. But I guess there is disagreement about that. What did you think it said? Waxman, Given my chosen line of work, it may be neat for me not to inject myself into this debate. Breyer, No, no, but I'm sorry. You're an informed reader, and I thought Mead definitely did not say that. That was the dissent's characterization of what it said. Waxman, Giving the dissent its full weight, I had understood both the majority and the dissent to explain that notice and the existence of formal notice and comment rulemaking is an important indicator of a congressional, one indicator of congressional delegation of rulemaking authority. Breyer, But not exclusive. But not exclusive. Ginsburg, Mr. Waxman, why are we getting into all of this? Because there is no question in this case that the Federal Reserve Board had authority to issue Regulation Z. There is no question about what authority Congress gave to the Board. Waxman, Correct. Ginsburg, So the only question is, so the Board adopts Regulation Z, and then a question comes up, what does it mean? Surely the Board that wrote the rule is, first and foremost, the proper interpreter. Waxman, I agree with that, and as to why we are getting into all of this, you know, I had a prepared statement that actually was going off in a different direction. Not in the sense that I'm disagreeing with the Court, but the point that it's in the interest of you, is it, this method of proceeding? So do I understand, just before you move in the direction you'd like to, I understand your view to be that Chevron and Auer apply, and it's consistent with Mead, because you have more indications that Congress delegated this authority to the Board than were present in Mead. Waxman, That's correct. And I think, you know, to the extent that there's anything more that's needed, It seems to me the icing on the cake here is that the rulemaking that I've been discussing, during which, over the course of several years, the Board engaged in consumer testing, in surveys, in comments, and decided to change its regulation, it produced  a major change, an entirely new section of Regulation Z, 226.9, that establishes as a new requirement what the Respondent in this case erroneously ascribes to the previously unamended text, and that is, it seems to me. Sotomayor, I do think, counsel, that that major change doesn't have to be the way you describe it. The difference between either contemporary notice and or 15-day notice versus 45 is a significant change. That's correct. And so it doesn't need to have been precipitated solely by a decision that the old rule, if it's as your adversary advocates it, didn't exist. I agree, Justice Sotomayor, that that one of the two changes that the Board made could be characterized and was, in fact, a major change. But if the Court will take note of the pages, the Federal Register record sites that we've provided on page 29, note 7 of our blue brief, and that the Federal Reserve Board's amicus brief in the First Circuit provided at page 12a of the government's The Board in 2009 was very careful to explain, as it did in 2007, that it was making in this respect two major changes. One is that in those instances in which the contract was being changed, that is, a term of the contract was being changed, advance notice of 45 days would be required regardless of what kind of change it was. But that when there was a rate increase, quote, due to delinquency, deficiency or penalty, not due to a change in contractual terms of the consumer's account, reference should be made to new subsection G. And the Federal Reserve Board was very, very clear that it was making two different changes, one to extend the advance notice period with respect to changes in terms from what the original disclosure provided, and another to provide that if you are increasing the rate, even if it is entirely consistent with the initial disclosures, you are required by this new subsection to provide advance notice. Alitoso, may I ask you a question about how the contract works in the situation in which a cardholder is found by, was found by Chase to have defaulted by failing to make some payment other than payment on the Chase credit card. So you determine, I guess from information obtained from a credit agency, that the cardholder has failed to make payments to someone else on time. You conclude that the cardholder is in default. You increase the interest rate. How is the cardholder, knowing, thinking that he or she has made all Chase payments on time, is not going to be alerted to the fact that there may be an increase in the rate? So how is that cardholder going to realize what's happened just by scrutinizing the monthly statement and seeing that the little interest figure is different from what it was the last time? Waxman. Yes. And now, of course, we're talking about a rule that's, it had been amended 2 years ago, but under the old regime, the cardholder was on notice. I mean, there had to be, and the Reg Z commentary was clear, that in order for it to be a default rate, it had to specify in the initial disclosures both the precise triggering event, that is, what constitutes a default. And here there's no doubt that it was specified that what constitutes a default is a default or failure to make a payment to any creditor. And there also has to be a specification of the maximum rate that could be applied as a result. Now, in this case, as the Board explained, the consumer would be notified in the next monthly statement, and it is pretty prominent, that the interest rate applied to all balances for that month was as follows. May I save the balance of my time? Mr. Waxman, you referred to footnote 7 on page 29 of your blue brief. Is that what you said? I hope I have this right. No, I'm sorry. It's footnote 7 on page 29 of our petition. Of the petition. All right. Thank you, counsel. Mr. Palmore. Mr. Chief Justice, and may it please the Court. During the relevant time period, the Federal Reserve Board's Regulation Z did not require provision of a change in terms notice when a credit card issuer merely implemented a contractual penalty rate provision that had already been disclosed. This is clear from the staff commentary to the rule, from the Board's own statements in the Federal Register when discussing changes to this very rule, and finally from the amicus briefs filed by the Board in the First Circuit and in this Court. I think it's important to put the particular regulatory provisions here in a larger context, because the policy question at issue here, whether there should be advance notice under these circumstances, is not new. It did not arise with this litigation. It's been the subject of intense regulatory focus at the Board since 2004. It's been the subject of two rounds of notice and comment rulemaking, of consumer testing, and finally of an amendment to the rule to provide notice under these circumstances, notice that in the court of appeals view had always been required, unbeknownst to the Board or anyone in the regulatory community. Roberts I take it apart from the amendment to the rule, you think those circumstances provide for Chevron hour deference? Palmore I do. This is, of course, not a Chevron case. There's no provision in the Truth in Lending Act that deals with subsequent disclosure. The subsequent disclosure is an hour case. Roberts Hour Long Island health care case? Palmore It's an hour case. And we believe that all of these provisions, certainly the staff commentary deserves deference, and that was the holding of this Court in Mill Holland, in the Mill Holland case. But also the Board's own authoritative statements in the rulemaking proceedings about what its old rules meant certainly deserve deference, and we believe the amicus briefs do as well. In 2004, it was the very same. Scalia You know, we don't do that with Congress. When a later Congress says what a statute enacted by an earlier Congress meant, we don't retroactively say, well, that must be what it meant. Are there other examples of where the Board says what a prior rule meant that we defer  Palmore Well, this Board, this Court, of course, in Long Island care at home, deferred to an internal advisory memorandum that was provided after the court of appeals decision that was at issue. That was an after-the-fact reading, and it was a change in policy. In the context of our deference, when you are looking to the author of the agency's regulation to elucidate what that regulation has meant, means the Court has looked at a broad range of material, because it understands that when Congress delegates rulemaking authority to an agency, that it also, as an adjunct to that, delegates authority to interpret that, those rules. So in 2004, the Board launched a proceeding because it was concerned with the very issue that underlies this litigation. And then in 2007, it issued rules to address this situation. And in that rulemaking notice, and this is at page 12 of the blue brief, the Board described what the old rules required. And it did so in a way that's irreconcilable with the court of appeals view of what the old rules required. The Board noted that staff comment 9C1 did not require provision of a change in terms of notice when a specific change had been previously disclosed. Kagan. Mr. Palmore, what would the Board's position be on the following hypothetical? That a card issuer says when any of 50 different things happen, so 50 different triggering events, the issuer can raise the rate anywhere up to 300 percent, so has complete discretion if any of a quite large number of triggering events occurs. And then one of those 50 triggering events occurs, and the card issuer says, okay, we'll raise the interest rate to 42 percent. Would there need to be notice for that? Under the old rule, no. Under the old rule. Under the old rule, no. There's a specific staff comment 6A211, which deals with the initial disclosure of penalty rate provisions. And it said there are two requirements of specificity. The specific maximum rate that may be applied must be disclosed, and the specific event or events that could lead to imposition of that specific maximum rate must be disclosed. Ginsburg. Mr. Palmore, suppose there was no triggering event, but in the initial statement the company said, we reserve the right to raise the interest to X amount, no triggering event, just a reservation of the right to raise the interest. Would that have to be and then it implements that later on. Would the cardholder have to have notice of that under the old rate? Yes. Under staff comment 9C1, the staff makes clear that if there's a general exercise of a change in rates pursuant to a general reservation of rights clause that's not specific with respect to the maximum rate that could apply or the specific triggering events that could lead to imposition of the maximum rate, that advance notice is required. But the staff contrasted that to the situation we have here, when the specific change is previously disclosed, and it provided some examples, the third of which is quite analogous here. It's a situation where the cardholder has agreed to maintain a certain balance in a savings account at the risk of having his rate go up if he goes below that balance. And when was that staff comment made? That's been there since 1981, Justice Kennedy. But going back to the 2007 notice of proposed rulemaking, the Court specifically the Board specifically addressed this situation. It said, ''Some credit card account agreements permit the card issuer to increase the periodic rate if the consumer makes a late payment. Because the circumstances of the increase are specified in advance in the account agreement, the creditor currently need not provide a change in terms notice. Under current 226.7d, the new rate will appear on the periodic statement for the cycle in which the increase occurs. This statement by the Board authoritatively interpreting its rules is inconsistent with the court of appeals view of the Board. Roberts Could you address your friend's contention that because the notice doesn't occur, the notice that the increase has gone into effect doesn't occur until the end of a billing cycle, it's a retroactive increase without notice? It's a retroactive increase without notice that was specifically disclosed initially. So if you look to the cardholder agreement here on page 20A of the petition appendix, Chase was up front that that's what would happen, that the change would be, the increase in rates would be applied to existing balances, and that consistent with the statement from the notice of proposed rulemaking, that the consumer would find out about that when he received his next periodic statement. That's a backward-looking statement. That's inconsistent with the court of appeals view that advance notice had always been required. The court of appeals tried to dismiss this statement and others like it as incidental descriptions of current law. Roberts But it is correct to characterize what's being allowed under your interpretation as an increase in rates without notice. Without advance notice. There are actually two kinds of notice under the old rule. Now there are three. The petition has to be. Advance notice is without notice, right? Right. It has to be disclosed initially, had to be disclosed initially, and if the cardholder didn't like the term, he didn't have to sign up for that card. And then it had to be disclosed subsequently on the periodic statement immediately following the rate increase, which would typically be within a matter of weeks. Now, the board now believes that there should be a third clause.  What would have to be disclosed, just the increase in rate? Roberts The new rate. Scalia Not the reason for the increase. Roberts Not the reason. Under the new rule, a general reason has to be given. So when the court of appeals described this as an incidental description of current law, it was correct that this is a description of current law, but it wasn't at all incidental. It was inherent in the rulemaking proceeding. The agency needed to explain what its old rules required while it was so that readers could make sense of what it was proposing to do to those rules. And then, as Mr. Waxman said, when the board then adopted amendments, it did two different things. It changed 226.9c, the provision at issue here, to extend the notice period to 45 days, but then it did something additional. It adopted a new subsection, 226.9g, to provide for notice in situations where there was no change in terms, where, by contrast, the card issuer was simply implementing terms that had previously been disclosed. Alito Did the board think that requiring the card issuing company to provide immediate notice would be very burdensome? And if not, what was its reason for interpreting the regulations either way? I think it's important to note that in 1981, as we discussed earlier, there was no provision in the Truth in Lending Act requiring subsequent disclosure at all. And the focus in the statute at that time and in the board at that time was on the importance of initial disclosure. And it was thought that initial disclosure was the key tool that consumers could use to comparison shop for credit. And the board wasn't as focused on things that happened later in that credit arrangement. And it thought that the initial disclosure and the subsequent disclosure was sufficient in the same way that in a variable rate plan, there's initial disclosure of a variable rate and there's subsequent disclosure on the periodic statement after the rate adjusts, there was no requirement and there still is no requirement that there be advance notice when a variable rate increases. The consumer finds out about it on the periodic statement within a matter of weeks of the rate adjustment. And the board previously viewed these penalty rate provisions in much the same way. Now, the board has now come to a different judgment. Roberts. Thank you, counsel. Mr. Beck. Mr. Chief Justice, and may it please the Court. The question in this case is whether a bank must provide notice of a change in terms when, after prominently disclosing a specific purchase rate in the cardholder agreement, the bank then changes that rate with that – then changes that rate based on a reservation of discretion in the fine print of the cardholder's favor. Changes the rate in the cardholder's favor. Changes the rate. If the rules, the regulations as they exist as relevant to this case provide that you do not need to provide notice if the interest rate is reduced. Is that your question? But would you – would it be in the greater interest of your client if the initial notice said, we're going to raise it to the top, no discretion? There would – Justice Ginsburg, there would still be discretion. We're not – and nothing we say would take away discretion or discourage discretion. We're simply saying that either the credit card company has to decide specifically what rate will apply beforehand and put it in the cardholder agreement, or it can And then when it decides which rate it wants to apply, it would then inform the borrower what that rate is. But if it says, we prefer one notice to two, so, sorry, we can't give our cardholders that benefit, we'll say, this is the rate, this is going to be it, then we'll spare ourselves a second notice. Right. And there's – but there's been no showing that this notice cost would be – would be a significant burden on the credit card companies. And the important thing is that if you don't know, if you don't get that notice and all you know is that the credit card company has discretion to raise the rate, then you never know for sure whether your rate has even gone up or not, much less how much it's gone up. So you never have that opportunity to go and see whether there's a better-priced loan available. You might not – you might miss an opportunity to avoid making a purchase that would – that would be at a rate higher than you expected. And the lack of that ability – that ability to shop between loans is really the central motivating factor. Ginsburg. Well, you know the highest rate, because that's stated in the original notice. And you could shop on the basis of that? You could, but you wouldn't know that the rate had gone up at all, because all you know is that there's a maximum rate and the credit card company has discretion to raise the rate or not. So absent any notice, the assumption would be that the rate hasn't changed, that there's not a difference. You get the notice with your next statement, but you're talking about the purchases made before the next statement, right? Right. You don't get notice on the next statement. Well, you get notice if your rate's changed. It would show it, wouldn't it? It'll state, Your Honor, it'll state on the statement that what your rate is. Right. But it will not tell you that the rate has changed and it won't tell you how much it's changed. So you'd have to figure that out by yourself. So it's not notice of a change in that sense. Well, it's to figure out. I mean, we had been paying, what, 10 percent and it's now 25 percent. It would seem evident on the face. But that doesn't solve the problem of the purchases that you have made before you got that statement. Well, that's correct, Your Honor. It still doesn't solve that problem. And when the rate is applied retroactively back to the beginning of the cycle, so this would go back to the first of the month, even before the default occurred, as happens in this case, then the problem is exacerbated even more. Mr. Beck, just to clarify your position, if the initial agreement said your rate is 10 percent, but if you are delinquent, your rate will be 20 percent. So not up to 20 percent, just 20 percent. It's an automatic increase in your rate. In that case, would notice – would subsequent notice be required? I think if the disclosure was specific and prominent as required by the initial disclosures and it wasn't retroactive, then I think the best reading of the rules would be you would not need to disclose that. So if you don't need to disclose this, and I think that this is the import of Justice Ginsburg's question, what's the difference between going, okay, we'll do the initial agreement, 10 percent to 20 percent, then we can always lower the rate without providing notice, we'll go back down to 12 percent, and now you have a 12 percent rate. What's the difference between doing that and, on the other hand, doing what the card issuer said here, which is if you're delinquent, we have the discretion to go up to 20 percent, but, you know, we could also go to 12. Well, the easy answer to that question is that it's different because the language of the regulation specifies a different result in each case. Section 226.9c2 says that no notice is required when any component of the finance charge decreases or is changed in the customer's favor. So there would be, under the plain language of the regulation, no need to provide notice there. But I think the intent of the question is Chase's argument about there's no practical difference between the two, that there's basically no harm from not telling people about their rate change. And we disagree with that as well, first of all, because, as I was saying to Justice Ginsburg, that you need to have the notice that there has been a change at all in order to realize that you might want to avoid making extra purchases or consider not throw away the low APR offer that comes in the mail, for example. And also, aside from that, we think that when you have only a maximum rate, that's basically the equivalent of a range of possible rates between the initial rate and the maximum rate. And that undercuts the ability to compare loans at the time of the cardholder agreement, even before the whole default comes into play, because at that point you have to compare two loans with two possible ranges of rates. And the key factor between the two, the value of the two loans, is how the credit card company will issue, will use its discretion. Roberts, Well, that's just saying that the problem that Justice Ginsburg is concerned with isn't likely to come up very long, because a credit card issuer realizes he's not going to get chosen by a consumer if he says your rate is going to be somewhere between 5 and 20 percent. No one's going to sign up for that card. Well, that's part of the problem, Mr. Chief Justice, because the point of TILA – the central motivating purpose of TILA is to provide clear and up-front and specific disclosures. And that would put the burden on the consumer to look into the fine print, to figure out the conditions, and after judging all the applicability of those conditions, to figure out how it would apply and compare with other loans. Ginsburg And it's fine to say, Federal Reserve Board, this regulation that you had and that you explained a number of times was a bad one. You should change it, which they did. But you are up against a regulation that both sides say has some ambiguity, but that the Board has said what it meant a number of times. So is the Court free to say the new rule is much better, so we're going to say that that's what the old rule was as well, in the face of what the Board has said? No, definitely not, Justice Ginsburg. But why not? Can't an agency interpret its own rules? I thought there's a long line of cases, Udall, Vitant, whatever it was. I mean, there are like 50 of them. Yes. Breyer And an agency can interpret its own rules, and if it has authority to make the rule, it can decide that it means something different. Why not? We're in the law, does it say they can't do that? It doesn't, Justice Breyer, and all we're saying is that agencies speak with varying levels of authority, and those different methods of statement make a difference in how much deference will go towards those statements. And what we have here is the official staff commentary, which the Board has designated as the official source of interpretation of the rules. And we're asking the Court to read those rules and defer to those. Breyer But at the Board, isn't there realism in this? When you read what the Board later said in these reports, you'd say, well, this is what the Board now thinks. And what in the law prevents the Board, which is in charge of its own regulations, from telling us what it thinks if it's in good faith and isn't making up some kind of ex post rationalization? That's the word used, you know, in the briefcase. I think that the Board itself made that law when it decided that it would issue official staff commentary through a notice and comment process and interpret the rules in that way. But the problem with that is in the Ninth Circuit split about the official statements, and Judge Cudahy gave a very cogent explanation of why the majority just did wrong in how it read those official comments. So you're relying on what two judges have said the official interpretation was against the dissenting opinion and the Board itself, saying that's what we meant in our official comments, in our official comments. Well, we think that Justice Cudahy's analysis made the same mistake that other courts have made in examining the regulations, which is to defer to the unofficial statements of the Board, the Board or the Board's staff, before coming to a conclusion about the plain meaning of the official regulations. Ginsburg. What about the invited brief in the First Circuit? Well, there's no question that the invited brief is against our position, and we certainly wouldn't argue otherwise. You talk about plain meaning. I thought you agreed that the regulation is ambiguous. No, we don't agree that the regulation is ambiguous. And I'd like to talk about that. Section 226.9 is the relevant change of terms provision, and it states that notice is required, quote, "...whenever any term required to be disclosed under section 226 is changed. And section 226.6, in turn, states that there is a required disclosure of each periodic rate that may be used to compute the finance charge. And so those two sections working together say that you have to disclose when there is a change of terms, and that one of the terms that has to be disclosed is the interest rate. And, in fact, the interest rate is the most important disclosure. But the rates that may be charged, that hasn't been changed. That still remains what it was. But I don't think the word may here can be read to exclude the requirement that the bank also disclose rates that are charged. Scalia You're the one that's reading it to say something different from what it says. It says the rates that may be charged. That's the term, these rates may be charged. That term hasn't been changed. You want to change it to the rates that are charged. But even the board, and even Chase, does not argue that you do not have to disclose the actual purchase rate at the beginning of the agreement. Everybody agrees that that has to be disclosed, and that has to be disclosed with specificity. So the word may has to include both rates that might be applied and rates that are applied. And the reason the word may has to be there is because it's quite possible that a rate may never come into play. For example, if you have an initial rate that changes at the end of 6 months and you leave the credit card before the 6 months are up, then that new rate will never come into play. But that doesn't mean you don't also have to disclose the rate that happened at the beginning of the credit card. Scalia. Well, I think it's at least a horse race, and that brings us back to how much deference you give to the board. You're trying to make the argument that it's clear. The fact that it says may be charged alone makes it unclear, it seems to me. Well, I would say that even the government doesn't agree with that, that may means that, because that would the government doesn't argue initial disclosures don't have to be specific and don't have to be made. The government's argument is a little bit different. What they're saying is that the word term in section 226.9 means contractual terms rather than credit terms. And that's a different argument because it doesn't, it wouldn't affect the initial disclosures. It would only mean that you don't have to give subsequent notice if you haven't changed the contract in the first instance. And so these are actually somewhat different theories. And under the government's theory, there would be no role for section 226.9 to play because you would, the only times it would come into play is when there's a change in the contract. And any time there's a change in the contract under the basic contract law of every State, you have to provide notice at least to the other party to the contract. So the only time notice would be required under section 226.9 would be when the contract law requires that notice to be given anyway. And even worse than that, it would actually cut back on the required notice that would be available under contract law because, for example, Delaware says you have to give 15 days' advance notice of a change in terms to a credit card agreement in the event of a default. And under this reading, you would only, even if the creditor changed the terms of the contract, as in increased the default rate above the maximum that the contract would authorize. So the contract says we can charge you 30 percent in the event of a default and you impose an interest rate of 100 percent. Then even in those circumstances, you only have to provide contemporaneous notice of the change. So you would basically have to put a letter in the mailbox on the day that you implement the new 100 percent interest rate that was not disclosed in the initial agreement. And our submission is that that's not a reasonable interpretation of section 226.9. And it is true that the rules have been amended, but we have to look at the purpose of the rules from the point of view of the board which enacted those rules in 1981. And we can't assume that the board at that time expected a set of rules that would never require subsequent notice to be supplied unless there was a change in the terms of a contract in which notice would have to be required anyway. The next point that the parties, aside from the language of the subpoena, is that the regulation itself, the parties rely on the official staff commentary, as do we, as supporting their position. And the parties argue that the word specific allows them to the part, I'm sorry, the government and Chase Bank argue that the word specific allows them to specify in advance only the maximum rate and that the word specific encompasses a maximum and the circumstances of causing that maximum to go into effect of a universal default situation, where if you default to any creditor or make a late payment to any creditor, then it triggers the new rate, which goes up to a discretionary maximum. Now, it's our contention that that kind of situation with universal default and a discretionary maximum rate is not a specific disclosure under any sense of the word. And the Ginsburg So we're getting back to what was my initial question. So you say you can't have flexibility that would favor the cardholder. If the initial notice is to count, then it has to be a fixed rate, and the company can't exercise discretion to reduce the rate. That's what you're saying, that a fixed rate would be okay. The problem with this is the company provided flexibility to reduce the rate in the interest of the cardholder. That's one of the problems. Other problems are that the triggering event is not specific enough and that it applies retroactively. But as to that problem, which we do agree is a problem, that's a result of the Board's decision to allow reductions in interest rates without requiring notice. And if it were true, that that meant that there's no point in giving a specific interest rate, because it could always, after all, be a board. Breyer, it doesn't say specific interest rate. I mean, my understanding of it, and I'm asking so you can correct me if that isn't so, is there's a regulation, Regulation Z. And then the staff put out some commentary and says, here's what that means, among other things, that the creditor can increase the rate at its discretion, and you have to give notice. You have to give notice. But you have to give some more notice if the original notice does not include specific terms for an increase. And then they give an example. I suppose the increase could occur under the creditor's contract reservation right to increase the periodic rate. That's a little obscure. As I say it, I'm not sure what I'm talking about. So then, later on, the Board puts out another, not called official staff commentary, but they say, we'll tell you what that specific word, specific terms, means. It means when they didn't say anything about the interest rate, or they didn't say when, in fact, they were going to increase the interest rate from X to Y, then they didn't give specific notice. But they did give specific notice if they told you when it would increase, by default, when you default. And they did give specific notice when they told you what the maximum it would go up to was, like 8 percent or 18 or whatever it is. Okay? So that's the Board's interpretation of its official staff commentary, which in turn is an interpretation of the reg. So if we're supposed to defer to their interpretation of their own reg, I mean, my goodness, wouldn't we defer like double to their own interpretation of their own staff commentary, which is an interpretation of a reg which they have an authority to issue under the State? You see my point. I see your point, Justice Breyer. But I would say that when you're talking about an interpretation of an interpretation, you're even further away from the original congressional intent that's empowering these kinds of interpretations. So I don't think that would. Breyer. I mean, that would be an argument you could make. You could say that their interpretation here exceeds their authority under the statute. Now, of course, you're right about that. All this stuff goes out the window. But it's a pretty hard argument to make that one, I think. And we're not making that argument, Your Honor. But what we are saying is that when you look at the interpretation, you have to judge it based on the authority that comes with it and the deliberation that comes with it. And in this case, we know that the Board itself has designated the official staff commentary with notice and comment process as the way that it wants to officially interpret rules. And there's good reason for that, because the Board was concerned, as Congress was concerned, that there was all these differing interpretations of the regulation Z that were going out in the form of opinion. Sotomayor What's left of your arguments if we decide that the statute is ambiguous, the official staff commentary is ambiguous, what's left? Is our deference then required? I think our to what to the amicus brief at least we can talk about whether the ANPR or the unofficial commentaries are due deference. What are we left with if we think there is ambiguity? I think in that case that the Court would have to defer to some degree to the brief, because that would be the only source of the Board's opinion in that case. So your case rises and falls on whether we believe that the statute is clear? The regulation and the official staff commentary. But I would also say that that deference does not have to be conclusive and it should not be given the force of law, even to the brief, because the agency has said that it doesn't specify the official staff commentary, so that there aren't these multiplicity of different opinions going out, interpretations of regulation Z, that are difficult for banks to access to figure out what their obligations are under the regulations. And so the Board itself doesn't want opinion letters and briefs and things to be interpreted as with the force of law, because that would, you know, change. Sotomayor, that's a different question. You're claiming that the Board's regulations supersede whatever deference Auer would otherwise give to amicus briefs? Yes. I think that's right, or at least limit that deference. I think that the Court should at least view the brief with more skepticism, given that the Board has wanted this very careful, deliberative process for making its rules. Mr. Bauer, most of your argument seems to rely on the official staff commentary. But the official staff commentary itself seems to me to cut against you. It says, ''No notice may need be given if the specific change is set forth initially. '' And then it gives examples of what that means. And it says, ''Such as an increase that occurs when the consumer has been under an agreement to maintain a certain balance in a savings account in order to keep a particular rate and the account balance falls below the specified minimum. '' So the example that they give is an example where there's a triggering event and there's a penalty rate that comes into effect as a result of the triggering event. And that's exactly what is true here. Yes. But in that case, Justice Kagan, you know for certain anyone who has a bank account can know what the balance of that bank account is. And so there's no uncertainty about whether the balance triggering event is satisfied. And then there's no uncertainty about what the resulting rate is, because Section 226.6 says you have to disclose each interest rate and the range of balances to which it is applicable. So you have to know both the interest rate and you have to know the triggering event. And that's very different from a case where you're not sure, first of all, whether the bank is going to use its discretion at all. You don't know for sure whether there's anything negative on your credit report that would even trigger that discretion to begin with. And you don't know if the discretion is triggered what the rate will be, because the bank reserves discretion to set it anywhere up to the maximum. Kagan. Well, on the triggering event first, it's true that you might know your account balance, but it's also true that you might know whether you paid your bills on time. What's the difference? Well, there's the discretionary difference, for example. There's no, in the bank situation, the rate is automatic and it's not based, it doesn't just trigger an exercise of discretion. Well, I don't see that in the example that's given. I don't see that it limits it to a situation in which there is an automatic increase in your rate rather than a discretionary increase in your rate. Well, for that I would look to section 226.6a.2, which says that each periodic rate and the range of balances to which it is applicable must be set forth initially. And so you know from the very beginning which balances on your account will trigger a certain interest rate. And so there's no, in that case, there's no uncertainty. But the other difference is that in the bank account situation, your balance is either above the maximum or below the maximum. But when you're talking about universal default, it's not always going to be obvious to you, first of all, whether anyone has reported anything to the credit agency. Oftentimes, certain creditors will overlook a certain late payment, for example, and maybe they reported one and it might not show up on your Experian credit report for months or years later, and then you will not know at what point it comes into play. So the only way to know for sure in that circumstance is to subscribe to the Experian credit reporting service, just like Chase does, so that you would know when there's any negative events that are reported to the credit agency that would possibly trigger Chase's discretion. But even in that case, you wouldn't know for sure whether Chase had implemented his discretion or not. And I wanted to say that the government, its own interpretation of the regulation is, especially when considering the amendments, is itself inconsistent, because the government says that the new regulation fixed the problem. But the new regulation uses the same language as the old regulation when it comes to what's required for a later change. It does carve out the default rate situation as a special case. But for every other kind of rate increase that's happened subsequent to the initial disclosure, it still uses as a triggering event any change in terms required to be disclosed by section 226.6. And if it were true that what the board wanted to do was fix this ambiguity and this problem that was set forth in the original regulations, then it would be very, very unlikely that the government would then implement the same language in the amended regulation and leave that same ambiguity in place, rather than clarifying exactly when subsequent notice would be required. Ginsburg-Miller, I'm not following that argument. I thought that the new regulation says, now, any time there's a change in the rate, whether it was announced originally or it comes up later, just in keeping it nice and simple, a rate change, you send notice. And you have to do it, give 45 days' notice. I thought that that's what the new regulation was. That's why I'm saying the government is inconsistent, because that's what the government says that it does. But what it actually, what the regulation actually says in 226.6c, the new version, any change required to be disclosed, a change in any term required to be disclosed by section 226.6, it's the same thing. It is true that there's a new subsection G that applies just to default rates, and it's very extensive because it covers a lot of aspects of default rates. So now I think it is clear that default rate increases would have to be disclosed. So the problem in this case would certainly be resolved. But the government's position is that there was a consolidation of all change notices into one 45-day notice period, and that's not clear from the regulation, because it still uses the same ambiguous language that was in the old version. So I think the Court, the Court should therefore, and that's, for us, that's an independent reason for the Court to view skeptically the government's submissions in this case and to view it with some skepticism instead of granting it the force of law, because the Court should consider that the Board itself hasn't adopted a consistent interpretation of the language at issue, unless there are any further questions. Roberts Thank you, Mr. Beck. Beck, thank you, Your Honor. Mr. Waxman, you have three minutes remaining. Waxman, may it please the Court, just three small points. My interest was piqued when Justice Breyer said that he acknowledged that he may have no idea what he was talking about with respect to a reservation of rights. And I just want to be clear that reservation of rights clauses, which are also referred to as change-in-terms clauses, are ubiquitous in these contracts and initial disclosures. They are a term of art, as the Board has recognized. And what they are is simply a statement by the credit card issuer in a consumer open credit account arrangement that, you know, it may decide to change any term in any respect at any time, and the Board's regulations make clear that if you do that, that is, if you implement a change-in-terms pursuant to a reservation of rights clause, you have to provide notice. Now, the specific — what specific means in the commentary to the regulation, which is a question that Justice Kagan asked, it seems to me was absolutely explained by the Board in a 1998 amendment to Regulation Z, which is comment 6A2-11, which is reprinted in relevant part on page A of our blue brief. This really is in our blue brief. Breyer, in your view, that staff commentary, the staff thing means, look, if you didn't say page 8, 8, if you failed to say in your original notice that default is the trigger, then you would have to give another notice. Correct. You have to — I mean, what it says, and I'm quoting from like four-fifths of the way down to page 8, quote, "...if the initial rate may increase upon the occurrence of one or more specific events, such as a late payment or an extension of credit that exceeds the credit limit, the creditor must disclose the initial rate and the increased penalty rate that may apply." And this was an amendment in 1998 that the Board made to Reg Z in what it recognized, what it stated was on account of the increased use of default penalty terms in the initial disclosures, that it wanted to make clear that if both the triggering event and the maximum rate was specified, there would be no change in terms if an increased rate were implemented. And finally, I just want to address my friend's point that there may be some question about whether TILA even authorizes the Board's explanation of the type of subsequent disclosure that was or wasn't required, and underscore Mr. Palmore's observation that in TILA until 2009, there was a requirement for initial disclosures, there was a requirement for periodic statements, but nothing at all about subsequent disclosures. Roberts. Thank you, counsel. The case is submitted.